IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | Case No. CR-25-151-SLP |
| ) | |
| ABDULLAH HAJI ZADA, ) | |
| ) | |
| *Defendant*. ) | |

## Mr. Haji Zada's Sentencing Memorandum

On October 7, 2024, Abdullah Haji Zada helped his older brother-in-law, Nasir Tawhedi, purchase two AK-47 rifles from undercover agents. He has pleaded guilty to one count of receiving a firearm for the purpose of committing an act of terrorism, in violation of 18 U.S.C. § 924(h). This is undoubtedly a serious offense, and nothing in this memorandum challenges the guilty plea or minimizes the gravity of the crime. The question before the Court at sentencing is narrower: was Mr. Haji Zada motivated by a radical ideology to harm others? Or was he a teenager helping a respected adult carry out a plan he did not fully comprehend or control?

### I.    The Circumstance of the Offense

Every relevant piece of evidence—digital, testimonial, and contextual—points in one direction: Mr. Haji Zada acted out of obedience, not ideology, and with limited understanding of what Tawhedi intended. He never promoted extremist views, sought out radical content, or communicated with any known recruiters. He took no independent steps to plan or advance violence, and there is no indication he understood the full scope of his brother-in-law's scheme. His conduct throughout this investigation shows compliance with another's instructions, not independent purpose. The following facts illustrate this.

1

### a. Mr. Haji Zada's was motivated by obedience not ideology

The digital evidence underscores a sharp contrast between the two co-defendants. Over one hundred radical-propaganda files were recovered from Tawhedi's devices; none were found on Mr. Haji Zada's. Forensic analysis revealed no extremist propaganda, extremist recruitment materials, or extremist communications saved to Mr. Haji Zada's devices. He never distributed radical content, participated in extremist groups on WhatsApp or Telegram, or engaged in hateful or violent rhetoric online or in person.

The only relevant search history entry was a single query for "ISIS," with no follow-up searches, links, or downloads. Mr. Haji Zada told counsel that he entered the term after hearing his brother-in-law mention it and wanting to understand what it was. That isolated search stands in sharp contrast to Tawhedi's sustained online radicalization campaign.

Of the hundreds of family and group messages reviewed, one image sent by Mr. Haji Zada might superficially appear ideological: a silhouette making the Tawhid gesture with the caption, "Judgment belongs to none but Allah." It's unclear if this image is extremist propaganda, as the Tawhid gesture is frequently used by non-extremist Muslims in sport and pop-culture. Regardless, he was sixteen at the time. In context—absent any other radical material or expression of belief—this isolated post does not indicate extremist intent.[1]

During Mr. Haji Zada's FBI interview, agents presented eighteen items of Islamic propaganda. Seventeen of which came from Tawhedi's devices. Only one originated on Mr. Haji Zada's phone: a short e-book by Ahmad Zahir al-Islami discussing the moral duty to speak against wrongdoing. The document contains no calls to violence, political content, or ideological

---

[1] The FBI report mentions Mr. Haji Zada sent multiple images involving the Tawid gesture. This is the only image provided in any FBI report, and counsel was unable to locate any more images on his phone.

language. The contrast between the two men's digital footprints is unmistakable: one engaged in ideological proselytizing; the other showed none.

### b. Tawhedi's targeted influence over Mr. Haji Zada

The investigative materials indicate that Tawhedi's radicalization was revealed or accelerated soon after his marriage to Abdullah's sister, Maria. Over the following year he immersed himself in extremist content and joined Telegram and WhatsApp groups that circulated extremist materials. By mid-2023 he was posting extremist content and recording videos in which he presented as a self-styled preacher. During this same period, Mr. Haji Zada's father was on the road for weeks at a time, and Tawhedi assumed the role of religious and practical authority within the household. Tawhedi came to view the family's practice of Islam as insufficiently devout. He regarded Mr. Haji Zada's father as an incompetent spiritual leader of the family and took it upon himself as the one who should restore "true" faith within the household.

Viewed in sequence, Tawhedi's method for "purifying the household" depict a slow, methodical escalation. Tawhedi first created a family group chat in September of 2023 to begin circulating extremist material that was ideological but not explicitly violent—religious commentary, photographs of rifles and ammunition paired with Quranic verses, or images of dead civilians draped in cloth accompanied by captions about injustice.[2] None of these materials referenced ISIS or any designated terrorist organization. At this stage, the content conveyed grievance and identity rather than operational intent. None of the family members responded to or shared the material, and the exchanges remained one-sided.[3] TAW_014582-599.

---

[2] Some of the videos were not accompanied by English translations; descriptions are based on visible imagery and context provided by investigators. Nothing in those materials suggests explicit advocacy of violence.

[3] Maria Haji-Zada does send one extremist image to the group that is consistent in tone with the other material. This is the only communication in the group outside of Tawhedi.

3

This stands in sharp contrast to the extremist content Tawhedi was sharing privately with his wife, Maria, and posting publicly online. Digital forensics recovered numerous videos from his phone depicting violent acts committed by ISIS, exhortations to commit Jihad, and vitriolic denunciations of the United States and democracy. TAW_030099-121. Tawhedi shared some of these materials with Maria, and the two exchanged messages openly embracing anti-American sentiment and endorsing jihadist violence. His public social-media posts echoed the same rhetoric, glorifying ISIS and celebrating martyrdom. TAW_003323-44.

Beginning in June of 2024, the tenor and intensity of Tawhedi's communications shifted. He began messaging Mr. Haji Zada directly, first sending videos that condemned democracy and praised killing "infidels." He then followed with a series asserting that parental permission is unnecessary for jihad—including one titled, "Does One Need Parents' Permission to Participate in Jihad?." The video explains that a child need not seek parental consent because avoiding jihad itself is a sin. Another video targets his father, Abdul Manaf, by explaining that Afghans who earn money in democratic countries and permit women to work are worse than "infidels" and deserve the "ultimate punishment."[4] The final video, sent in late August, praises a man who beheaded his own father for befriending non-believers and extorted viewers to eliminate any family member who associates with someone outside a strict extremist circle.

Around this same period, Tawhedi was communicating on Telegram with known ISIS recruiters. Tawhedi does send these Telegram handles to Mr. Haji Zada at separate times along with Tawhidi's own Telegram handle. There is no explanation for why he did this in the messages or elsewhere. It's strange considering Tawhedi told the FBI that Mr. Haji Zada was unaware he

---

[4] Tawhedi fixated on Abdul Manaf's decision to allow the women of the household to work outside the home and repeatedly invoked it as proof of his spiritual weakness. He often used this grievance to undermine Abdul Manaf's authority and to portray himself as the family's true moral authority.

4

was even talking to these individuals. TAW_025231. Tawhedi tells the FBI that he worried about Telegram blocking his account, and this was likely a way for him to save the contacts. Regardless, Mr. Haji Zada does not respond to any of these messages and the Telegram logs confirm that Mr. Haji Zada never initiated contact, replied to, or interacted with any of these extremist channels.

Mr. Haji Zada never responded a single one of Tawhedi's propaganda messages, nor did he acknowledge, or discuss them with anyone. Like all their prior communications, they were entirely one-sided, reflecting Tawhedi's belief that he was spiritually guiding Mr. Haji Zada, not collaborating with an ideological partner. Despite thousands of recovered communications, not a single conversation between Tawhedi and Mr. Haji Zada—or between Mr. Haji Zada and anyone else—discusses committing an act of terrorism, or any aspect of Tawhedi's plot. Every exchange involving the two is either a one-way attempt at indoctrination by Tawhedi or a routine family matter that Mr. Haji Zada was asked to handle.

Mr. Haji Zada was particularly vulnerable to Tawhedi's influence because of his age and stage of brain development. Dr. Mary Beth Altier, a highly credentialed terrorism researcher who studies why individuals become involved in extremist movements, reviewed Mr. Haji Zada's case and provided an expert report. (See Exhibit 1, Expert Report of Dr. Altier.) She explains that individuals join or support extremist activity for different reasons. Some are "ideologues," motivated by deep belief in an ideology—what scholars call affective commitment. Others are followers motivated less by belief than by social bonds, obligation, or deference—what researchers term normative commitment. (*Id*. at 2–3.)

Adolescents, Dr. Altier notes, are especially susceptible to being radicalized by normative commitment. Because the parts of the brain governing impulse control, risk assessment, and moral differentiation continue developing until the mid-twenties. Young people are more likely to

5

conform to perceived authority and more vulnerable to grooming by adults. *Id.* at 7. Considering his age, family hierarchy, and the absence of evidence showing a deep belief in radical Islam, Mr. Haji Zada's involvement in extremism stems from normative commitment driven by the inculence and expectations of his family: he followed Tawhedi out of obligation and influence, not ideological conviction.

## II.     Characteristics of Mr. Haji Zada

Why would an otherwise well-behaved teenager completely comply with an adult's commands? To answer that question, the Court must try to view the situation through Mr. Haji Zada's eyes—those of a seventeen-year-old immigrant boy navigating an expectation of subservience at home against the pull of independence beyond it.

Mr. Haji Zada is a first-generation Afghan immigrant who grew up in a rural village before coming to the United States at age eleven with his parents and six siblings. After landing in Texas, he enrolled in Dallas public schools, quickly learned English, and soon began translating for his parents. His mother is illiterate and speaks no English; his father works long hours away from the home as a long-haul truck driver. Within six years the family moved five times—first to Texas, then to Virginia, then to North Carolina, then back to Texas, and finally to Moore, Oklahoma, in 2023.

The repeated relocations and constant cultural adjustment made it difficult for Mr. Haji Zada to build lasting friendships. When he entered Southmoore High School as a junior, most social circles were already formed, and few students shared his background. He was polite and well-liked but remained an outsider. At the end of his junior year, one of his teachers recommended he switch to online classes to graduate faster. He started online school his senior year.

By most accounts he's done well fitting into American society. He loves the freedom and the opportunity it provides. He did well in school and showed initiative fixing cars and reselling used items online. And similar to any other American kid, he passed time eating hamburgers, playing video games, and watching SpongeBob with his brothers.

But the values of his upbringing remain deeply embedded in his daily life. His family comes from a world that couldn't be more opposite. Their culture emphasizes honor, hierarchy, and unquestioning obedience to elders—not individual expression and independence. And to understand how obedience could drive someone to get involved with such a serious offense, we must first look at some of the significant cultural differences.

Afghanistan is a society built upon a system of hierarchy and deference that is rigidly organized according to age and gender. Edward Zellem, *Afghanistan 101: Understanding Afghan Culture* (2014). Authority always flows from elder to younger and from men to women. Every member has a defined role to play regardless of placement on the cultural pecking order. *Id.* at 46. Leadership and respect are legitimized by seniority, so one's competence and character factors little into the calculation. *Id*. at 36. It is very much a non-democratic social model. There is always one singular authority in charge. And this person is tasked with all decision-making power with little room for debate. *Id.* at 37. Employees should never question their employer, students their teacher, nor children the adults.

In the family, the father "must be obeyed, and his ideas and decisions cannot be challenged." *Id.* at 31. Parents expect obedience from their children. And children faithfully serve and obey. Obedience and submission are the primary ways to express love and loyalty. And any disagreement or defiance toward an elder is a highly dishonorable and shameful act. *Id.* In the father's absence, the eldest son temporarily assumes the dominant role in the family. *Id.* at 126. If

7

the son is not old enough, then the wife makes decisions but must consult the father's brother on more serious issues. This dynamic gave Tawhedi a usurper's role—one both legitimized and respected—within the vacuum created by Abdul Manaf's frequent absences.

Under Afghani law, the legal age of adulthood begins at eighteen and the expectation of social compliance slowly begins to loosen. But due to the age-graded nature of the hierarchy, Afghani's don't view adulthood the same way Westerner's do. For example, men ages eighteen to thirty are often lumped into a lower tier junior adult category, and Afghan rulers younger than fifty years old rarely survive or remain in power due to their "immature" and "boyish" perception. *Id.* at 46.

Mr. Haji Zada is the eldest son in a large family of seven children. He was asked to complete many adult responsibilities without decision-making authority. He regularly translated documents, helped relatives navigate public systems, paid bills, signed financial documents, and assisted with errands for the household, extended family, and family friends. To outsiders, the expectations placed on Mr. Haji Zada may seem indicative of respect and authority in the house. But this is level of responsibility is surprisingly common in Afghanistan. In Mr. Haji Zada's household, such tasks were not marks of authority but of service. Starting at a young age, Afghan children are frequently entrusted with adult responsibilities. *Id.* at 126. Americans are frequently shocked by how mature Afghan children seem, which in turn, confuses many Afghan parents. *Id.*

This difference in response points to a cultural clashing point. In the United States, respect for adolescents and young adults is tied to maturity. And maturity is a flexible trait that can vary from child to child—necessitating a more nuanced analysis. In Afghanistan there is no such thing as mature children, there are only children. Maturity carries the same weight as competence, knowledge, or expertise, in the respect calculation—it's a non-factor.

His role was always to complete a task asked of him; not command others to do so. His advice was never sought by the family elders, only his instruction or explanation. And most of the tasks he was told to do were simple, requested by women, and of the sort explicitly reserved for children in Afghan society. The text and tone of these conversations also show he had no influential status. To speak to an adult in this tone or manner would be a highly shameful and disrespectful act. And it's clear that the family followed this patriarchal norm by the way they spoke to Abdul Manaf and Nasir Tawhedi.

Three specific conversations cement Mr. Haji Zada's family status. In January of 2023, Mr. Haji Zada's brother-in-law, Ahmad, sends him a message advising him to let Tawhedi assume the role as the father of the family when Abdul Manaf is away because Nasir is older and would make a better father than him. Taw_030052. In August of 2024—two months before the arrest—Nasir Tawhedi sends an audio message to Mr. Haji Zada telling him to make sure he cleans the house before Nasir's friends arrive. Taw_0301481B19_Audios. And finally, Nasir Tawhedi's own comments—both to the FBI and the Court at his change of plea hearing—confirm that he viewed Mr. Haji Zada as a child not an equal. Repeatedly calling him too young to understand and comprehend what was happening. Taw_025232.

When FBI agents asked Nasir why Mr. Haji Zada was not as forthright concerning the details of the terror plot, he tells them that it's because Mr. Haji Zada is "very young" and "cannot tolerate some stuff." Taw_025232. Later, the agents ask Nasir why Mr. Haji Zada is lying to them, and he responds that Mr. Haji Zada might just be too young to comprehend what is happening. Taw_025197. Months later, when Nasir is reviewing the list of the government's questions before his change of plea hearing with his attorney, he initially refuses to say that he intended to commit this attack with Mr. Haji Zada, because Mr. Haji Zada was unaware of the terror plot. After

reviewing the evidence with his attorney, he eventually concluded that he could answer yes, because Mr. Haji Zada ultimately would have done whatever he told him to do.

### III.    A Downward Sentence is Sufficient.

Section 3553(a) directs the Court to impose a sentence that is "sufficient, but not greater than necessary" to achieve the goals of punishment. In determining what sentence meets that standard, the Court must consider the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect just punishment, promote respect for the law, afford adequate deterrence, and protect the public. When those factors are applied to Mr. Haji Zada and the record before the Court, a downward sentence is sufficient to serve every statutory purpose.

The investigative reports establish what Mr. Haji Zada did; it does not establish what exactly he understood, planned, or intended. At a minimum, it's clear that Mr. Haji Zada accompanied Tawhedi to buy two rifles and that he exchanged messages with undercover agents to set up that transaction. Based on his guilty plea and conversations with counsel, it's also known that he agreed to help Tawhedi use those rifles to attack innocent civilians on election day at some unknown location.

Mr. Haji Zada's cultural background and Tawhedi's statements about him, make it clear he played no significant role in conceiving or planning the offense. Within his family, and particularly in Tawhedi's eyes, Mr. Haji Zada was still viewed as a young subordinate—obedient, dutiful, and compliant, but not capable of "tolerating" or conceiving the kind of violence Tawhedi contemplated. He was given only the minimal information necessary to carry out instructions. Those same traits—responsibility, respect, and deference—are virtues in his culture, but here they

10

became vulnerabilities. Tawhedi recognized and exploited Abdullah's sense of obligation, weaponizing his obedience for his benefit.

Tawhedi's FBI interview underscores this dynamic. TAW_025271. His account of Mr. Haji Zada's awareness shifts repeatedly. At one point he claims Mr. Haji Zada knew the attack was on behalf of ISIS; moments later, after a pause, he concedes he is unsure. He makes it clear that Mr. Haji Zada was not aware of every detail of the plot and that he only briefly told him about it, later adding that there were things Mr. Haji Zada didn't know. When asked whether Mr. Haji Zada understood that he was to die a martyr, he again hesitates before answering, "maybe." These inconsistencies align with the broader record: Tawhedi's control was total, and Mr. Haji Zada's knowledge was limited.

Everything else the government cites as evidence of Mr. Haji Zada'ss supposed role in planning the offense collapses under scrutiny. Mr. Haji Zada, Tawhedi, and Abdul Manaf have all confirmed that the family was in the process of selling their house to move back to Dallas. The government's theory of a secret plan to sell the home behind Abdul Manaf's back and funnel the proceeds to ISIS rests entirely on statements Tawhedi made to his online handler, Malik, via Telegram—statements that Tawhedi himself later admitted were false during his FBI interview. TAW_025271.

Mr. Haji Zada does not recall signing any documents related to the 2024 home sale, though he acknowledges it is possible. He was routinely directed by family members to sign forms, open accounts, and complete government paperwork. A review of his phone confirms that he accessed the same electronic-signature platform used during the family's prior home sale in 2023. Similarly, his assistance to Tawhedi in obtaining a passport and translating at the Dallas Passport Agency was consistent with responsibilities he had long handled for other relatives. None of this conduct

11

suggests planning or intent—it reflects the same pattern of compliance and service that defined his role in the family.

Mr. Haji Zada told counsel that, until shortly before the purchase, Tawhedi explained that the AK-47s were to be used for recreational target shooting. As with hundreds of other errands, Tawhedi asked Mr. Haji Zada to search online, translate, and compare prices. Mr. Haji Zada complied without question. Only a few days before the purchase did Tawhedi reveal his true intent, telling him that the weapons were to be used to commit jihad on election day and urging him to "obey the will of Allah" and trust him. He said that he would. Mr. Haji Zada's account lines up with Tawhedi's statement and the rest of the evidence in this case.

His search queries do little to question Mr. Haji Zada's involvement but its worth briefly addressing some of them. The firearm searches were at the request of Tawhedi and done when he was still under the belief the rifles were for target practice. The searches give credibility to this. Questions about proper gun ownership, licensing requirements, and the legality of having a rifle in your car, do not seem consistent with acquiring a firearm to commit terrorism before dying a martyr. There is no credible reporting of a "soda bomb" ever being deployed for a terrorist purpose, because the energy output is far too low to be an effective weapon. Instead, they are usually only seen in context with science experiments or juvenile pranks.

The mention of an address in Washington, DC was not a search. It was phone data automatically picked up from a ping to a cell service tower. There are dozens of these types of files on Mr. Haji Zada's phone, just like everyone else's phone, pinging addresses to random locations all over the country. The uncontrollable bad temper meaning is presented as an isolated search, but in reality, it was part of a series of searches he did on Islamic virtues. There are also searches about the meaning of lust, greed etc. done around the same time.

Considering the nature and circumstances of the offense, Mr. Haji Zada's youth, limited understanding, and the vulnerabilities that led to his compliance, a downward sentence is sufficient, but not greater than necessary to accomplish the purposes of sentencing. Incarceration beyond what is needed to protect the public or promote respect for the law would serve only retribution, not rehabilitation. At seventeen, Mr. Haji Zada's brain and judgment were still developing in ways that left him especially vulnerable to manipulation by an older, authoritative figure like Tawhedi. But this also increases the ease and likelihood that Mr. Haji Zada can easily be rehabilitated. *See* Ex. 1. at 8. Developmental psychologists and courts alike have recognized that youthful offenders—particularly those driven by social or familial pressure rather than ideology—respond far better to structure, counseling, and supervision than to incarceration. *Id.*

These developmental realities are not only supported by scientific research but also recognized within the Sentencing Guidelines themselves. Pursuant to U.S.S.G. § 5H1.1, a downward departure may be warranted when a defendant's youthfulness at the time of the offense contributes to diminished judgment or heightened susceptibility to influence. The Commission has acknowledged that developmental and environmental factors—such as adverse childhood experiences, limited education, or unstable family dynamics—can delay maturity into a person's mid-twenties and increase vulnerability to manipulation. Those same factors are plainly present here: Abdullah's adolescence, cultural deference, and lack of peer support made him exceptionally susceptible to Tawhedi's control. His youth is therefore not merely chronological but functional, and § 5H1.1 directly authorizes the Court to account for that reality through a downward departure.

Empirical research also demonstrates that individuals convicted of terrorism-related offenses in developed democracies have extremely low rates of re-engagement or recidivism. *Id.* at 5. Studies place that rate below five percent, markedly lower than the 20 to 60 percent recidivism

13

rates observed among ordinary criminal offenders in the United States and Europe. *Id.* at 6. Successful rehabilitation and disengagement from extremism also depends on what motivated someone to get involved. Ideologues are the least likely to disengage from the belief. *Id.* Alternatively, rehabilitation of individuals driven by a normative commitment to a relationship or social structure is very achievable. Often all it takes is removing the person from the relationship that is pulling them into extremism.

Mr. Haji Zada has no previous criminal history. He was a responsible kid who did well in school. He has a passion for working on cars and had plans to become a certified mechanic with the goal of one day starting his own business. He has no documented history of disciplinary issues, at school, in the home, or since he's been incarcerated. This combined with his youth, lack of entrenched ideology, and amenability to counseling, underscore the public safety risk Mr. Haji Zada poses is extraordinarily low, and it is unlikely that he will reoffend in the future.

## CONCLUSION

Mr. Haji Zada's conduct was serious, but his culpability limited. His youth, immaturity, and cultural conditioning made him unusually susceptible to influence, yet those same traits make him highly capable of rehabilitation. For these reasons, the defense respectfully requests that the Court impose a sentence that departs or varies downward from the advisory guideline and statutory range. Whether viewed as a departure under U.S.S.G. § 5H1.1 or as a variance under 18 U.S.C. § 3553(a), the record establishes that such a sentence is sufficient—but not greater than necessary—to accomplish the purposes of sentencing.

Respectfully submitted,

/s/ *Kiefer M. Rose*
Kiefer M. Rose, OBA #35214
Assistant Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee, Suite 109
Oklahoma City, Oklahoma 73102
Telephone:    (405) 609-5955
Facsimile:    (405) 609-5932
kiefer_rose@fd.org

/s/ *Jeffrey M. Byers*
Jeffrey M. Byers, OBA #17499
Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee, Suite 109
Oklahoma City, Oklahoma 73102
Telephone:    (405) 609-5980
Facsimile:    (405) 609-5932
Jeff_Byers @fd.org

## Certificate of Service

I hereby certify that on October 10, 2025, I electronically transmitted the attached document to the Clerk of Court using the ECF system for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF Registrants:

Assistant United States Attorneys Jessica Perry and Matt Dillon

/s/ *Kiefer M. Rose*
Kiefer M. Rose