July 1, 2025

Mary Beth Altier, Ph.D.
*Clinical Professor • Center for Global Affairs • School of Professional Studies*
*New York University • 7 East 12th Street • New York, NY 10003*
*Office: 212-992-8377 • Mobile: 609-510-9442 • marybeth.altier@nyu.edu*

**Expert Report – Mary Beth Altier, Ph.D.**

1. <u>**Evidence of Expertise in Terrorist Engagement, Disengagement, and Deradicalization**</u>

I am a Clinical (Full) Professor at the Center for Global Affairs in New York University's School of Professional Studies. For the past 20+ years, I have engaged in extensive study of the reasons why individuals support or participate in political violence, including terrorism, in developed and developing democracies. For the past 13 years, much of my research has centered on the disengagement, deradicalization, and reintegration of violent extremists. This research has included large-scale reviews of related literature and empirical findings from criminology, sociology, social psychology, and industrial and organizational psychology; the compilation and analysis of large-scale datasets on violent extremists' attitudes and behaviors; and in-depth, in-person interviews with violent extremists across Islamist, far-right, and ethno-nationalist ideologies. My research has been published in numerous, well-respected peer reviewed journals and policy reports and cited in more than 1,100 academic texts. I have received two awards from the American Political Science Association for my research contributions.

The recognition and demand for my expertise are evident in the high volume of invitations I receive to brief or participate in workshops with policymakers and practitioners globally; my participation on 5 Editorial Boards including the top terrorism journals in the field; and the requests I receive to author policy reports and to contribute to high-quality edited books including forthcoming chapters in *The Handbook of the Psychology of Terrorism* and *Terrorism Rehabilitation and Assessment: An International Perspective*. This demand is a testament to the value and relevance of my insights in the field of terrorist disengagement and deradicalization.

Specifically:
   a. I have presented my research at numerous professional conferences, including the *Annual Meeting of the American Political Science Association* and the *Annual Meeting of the International Studies Association*.
   b. I have been involved since 2011 in various engagements with US and foreign governments as well as international organizations (NATO, the UN) to share my research findings and advise on disengagement and deradicalization programming and practice. This work includes ongoing review and advisement on general in-prison and post release programming for violent extremist offenders.
   c. I have convened and participated in conferences internationally that bring together academics, policymakers, and practitioners working on disengagement and deradicalization programming to help inform policy and practice. In the last 12 months, I participated in working groups on "Probation and Rehabilitation" and "Re-engagement and Recidivism" at the Eradicate Hate Summit in Pittsburgh, an International Specialist Conference on Government Disengagement and Deradicalization in Germany, and a Workshop on Standards for the Use of Former Violent Extremists in P/CVE work in New York.
   d. I have presented briefings, participated in meetings, and been invited to share my insights with US local and federal law enforcement and other government agencies. I was solicited to write a policy report on violent extremist disengagement for the United States Institute of Peace.
   e. I have been invited to participate in panels or closed discussion groups for the most prominent think tanks in the field of security studies, such as the National Counterterrorism Innovation,

EXHIBIT 1

Page 1 of 13       1

July 1, 2025

    Technology, and Education Center (NCITE), the Council on Foreign Relations, the United States Institute of Peace's RESOLVE Network, and the CVE group at the Washington Institute.
- f. I receive invitations to guest lecture in professional presentations for practitioners, policymakers, and academics.
- g. I receive a very high volume of requests to review relevant manuscripts related to terrorist disengagement, deradicalization, and reintegration, and political violence and political behavior more broadly, across the disciplines of political science, criminology, and psychology. I serve on the Editorial Boards of the journals *Terrorism and Political Violence, Studies in Conflict and Terrorism, Perspectives on Terrorism, Journal for Deradicalization,* and *Behavioral Sciences of Terrorism and Political Aggression.*
- h. I routinely receive requests to serve as a reviewer for large-scale grants in the field offered by the National Institute of Justice.
- i. My expertise is sought by the media. I have been featured on *PBS* and quoted in outlets like *The New York Times, USA Today, LA Times, Bloomburg Businessweek, VOX, WIRED, Gothamist, Pittsburgh Post-Gazette,* and *Minneapolis Star Tribune*. I also have published op-eds related to terrorist disengagement and re-engagement for *Lawfare* and *The Washington Post*.

## 2. Radicalization and Engagement in Violent Extremism

**Radicalization** is the acceptance of an extreme ideology or belief system outside the dominant or mainstream views in society. Koehler describes radicalization as a process of "de-pluralization" of political concepts and values in which individuals reject or fail to tolerate alternative interpretations of their worldview.[1] Radical ideologies may help individuals make sense of a personal or societal crisis they may be experiencing and absolve them of any agency or ownership for their situation. These extreme ideologies may or may not promote violence, causing some scholars to distinguish between radicalization and violent radicalization[2] or radical belief and radical action.[3] Most individuals who possess radical beliefs will never engage in violent extremist or criminal behavior, especially under free speech protections in the United States. Radicalization is typically used to describe an individual's attitudes and beliefs, *not* their behaviors. Increasing rejection of or failure to tolerate alternative worldviews, however, is associated with the need to pursue one's vision of the world through violence.[4]

Radicalization then is different from **engagement in violent extremism**, which is behavioral and entails the promotion, facilitation, or perpetration of, often criminal, acts in support of a violent extremist group or cause. Individuals engage in violent extremism for different reasons. Some who engage in violent extremism are motivated by a deep belief in the extremist ideology and cause (*affective commitment*), while others' involvement may be motivated by a sense of adventure or belonging, the social bonds involvement provides, violent proclivities, the money or tangible goods one obtains, or the belief, as a result of socialization in the home or community, that one has a

---

[1] Daniel Koehler, *Understanding Deradicalization: Methods, Tools and Programs for Countering Violent Extremism* (Florence: Taylor and Francis, 2016), 74.
[2] Jamie Bartlett and Carl Miller, "The Edge of Violence: Towards Telling the Difference Between Violent and Non-Violent Radicalization," *Terrorism and Political Violence* 24, no. 1 (2012).
[3] Clark McCauley et al., "Understanding Political Radicalization: The Two-Pyramids Model," *American Psychologist* 72, no. 3 (2017).
[4] Koehler, *Understanding Deradicalization: Methods, Tools and Programs for Countering Violent Extremism*.

EXHIBIT 1
Page 2 of 13    2

July 1, 2025

"duty" to participate (*normative commitment*). Some individuals may therefore engage in acts of violent extremism without ever believing in the underlying ideology, instead driven by these other factors.

In understanding participation in violent extremism, it is important to highlight the difference between those driven by a normative commitment versus an affective commitment. Some children, for example, who grow up in Gaza might feel that it is their duty or expected that they will join and fight with Hamas as a result of socialization in their family or community; their participation is motivated by a normative commitment. This is different from a genuine belief in Hamas' underlying ideology motivating their joining and fighting with Hamas, which is an affective commitment. In simple terms, you could think about a child who pursues a medical degree because her parents expect it of her. She has grown up with the norm that she and all other children in the home will be doctors. Her pursuit of a medical degree is driven by a normative commitment or sense of duty as a result of socialization. If, however, the child pursues a medical degree because she loves medicine and always wanted to be a doctor, her pursuit of that degree is motivated by an affective commitment.

Scholars have tried to categorize violent extremists based on their motivations for involvement. Bjørgo, for example, describes three categories – *ideologues* (motivated by the ideology or an affective commitment), *drifters and followers* (motivated by social bonds), and *opportunists* (motivated by money or other tangible goods).[5] Nesser's study of jihadist cells in Europe similarly differentiates between *entrepreneurs*, *protégés*, *drifters*, and *misfits*. Entrepreneurs and protégés, Nesser argues, are typically deeply ideologically motivated and play key roles in recruitment and the development of plots. Drifters and misfits are more peripheral and have radicalization pathways more likely to be shaped by personal problems, deprivation, identity crises, a quest for adventure, or loyalty to friends and family.[6]

Due to different motivational factors, it is important to emphasize that some individuals may engage in violent extremism without ever believing in the ideology. Nevertheless, to maintain their relationships with others involved in violent extremism, including friends and family members, or the benefits they derive from involvement, individuals may exhibit a deep commitment to the ideology. For example, in an in-depth interview I conducted with a convicted white supremacist post-release, she revealed that during her involvement she would say things consistent with neo-Nazi ideology and even tattooed racist symbols on her body to display her commitment to the group as she did not want to lose her friends. The more she doubted and was disillusioned with her involvement, the more she displayed overt racism (i.e., more racist tattoos, rhetoric etc.) as she did not want the group questioning her loyalty to them or the cause.

Finally, the factors motivating one's engagement in violent extremism may change over time. An individual, for example, may first engage because of the social bonds or sense of purpose that involvement provides. Later on, their engagement may no longer be motivated by these factors but, for example, by a deep belief in the ideology or because they possess few alternatives outside of involvement.

---

[5] Tore Bjørgo, "Dreams and disillusionment: engagement in and disengagement from militant extremist groups," *Crime, Law, and Social Change* 55, no. 4 (2011).
[6] Petter Nesser, *Islamist Terrorism in Europe* (New York, NY: Oxford University Press, 2018).

EXHIBIT 1
Page 3 of 13         3

July 1, 2025

### 3. Deradicalization and Disengagement from Violent Extremism

**Deradicalization** describes an attitudinal change and is the process by which an individual gives up their belief in an extremist ideology. Koehler describes de-radicalization as a process of "re-pluralization" in which individuals begin to accept and tolerate alternative political concepts and values and/or see alternative means, besides violence, by which to pursue their worldview.[7]

**Disengagement** describes a behavioral change and is the process by which an individual stops engaging in violent extremism – that is, they stop promoting, facilitating, or perpetrating acts, often criminal, in support of a violent extremist group or cause. Disengagement has strong parallels with *desistance* in the criminal context.

*The Causes of Disengagement*
Just as individuals engage in violent extremism for various reasons, individuals disengage from violent extremism for different reasons. The literature divides these reasons for disengagement into *push factors* and *pull factors*. Push factors are aspects of one's involvement in violent extremism that push the individual away (e.g., loss of faith in the ideology (deradicalization), disagreements with members, difficulty living a clandestine lifestyle or carrying out attacks), while pull factors are things outside one's involvement in violent extremism that lure the individual to a more conventional social role (e.g., educational or employment opportunities or demands, family demands, new social networks). Research suggests that push factors are more important in explaining disengagement for those with a lengthy history of involvement or who are more deeply committed to the violent extremist ideology. Pull factors (or alternatives) are much more effective at influencing disengagement for those with a short history of involvement and lower level of ideological commitment.[8]

Violent extremists who believe in the underlying ideology often disengage without deradicalizing. That is, they give up their violent extremist and criminal behaviors, but not their beliefs. Their decision to disengage is often driven by various forms of disillusionment with their involvement or other push factors (e.g., conflict over the strategy or actions of the larger movement, disagreements with other members or leaders, not liking one's role or tasks, difficulty living a clandestine lifestyle) rather than de-radicalization.[9]

Research shows that one's decision to disengage and remain disengaged from violent extremism is not only shaped by the degree of satisfaction (whether ideological, financial, social etc.) they obtain from involvement, but also the investments they have made in their involvement (or sunk costs) and the alternatives or opportunities available to them.[10] Individuals with high sunk costs and few

---

[7] Koehler, *Understanding Deradicalization: Methods, Tools and Programs for Countering Violent Extremism*, 81.
[8] Mary Beth Altier et al., "Why They Leave: An Analysis of Terrorist Disengagement Events from Eighty-seven Autobiographical Accounts,"  *Security Studies* 26, no. 2 (2017).
[9] Altier et al., "Why They Leave: An Analysis of Terrorist Disengagement Events from Eighty-seven Autobiographical Accounts."; John G. Horgan, *Walking Away from Terrorism: Accounts of Disengagement from Radical and Extremist Movements*, Political Violence, (Oxford: Routledge, 2009).
[10] Mary Beth Altier, Christian Thoroughgood, and John Horgan, "Turning away from terrorism: Lessons from psychology, sociology, and criminology," *Journal of Peace Research* 51, no. 5 (2014); Caryl Rusbult, "A longitudinal test of the investment model: The development and deterioration of satisfaction and commitment in heterosexual involvements," *Journal of Personal and Social Psychology* 45, no. 1 (1983).

EXHIBIT 1
Page 4 of 13     4

July 1, 2025

alternatives may remain engaged or "trapped" in violent extremism despite profound dissatisfaction with their involvement and a strong desire to leave violent extremism behind.

*The Process of Disengagement and Deradicalization*
Disengaging from violent extremism typically entails a drastic change in one's social role and sense of identity and is often described as a vacuum-like process.[11] Individuals must adjust to their new social role and begin to craft a new identity; they must process their involvement in violent extremism, including any related trauma, and often confront significant stigma. Stigma and lack of community acceptance is especially problematic as it can limit opportunities, prevent the development of pro-social relationships, and reinforce the individual's violent extremist identity – all factors which may make re-engagement more likely.

Many who believe in the violent extremist ideology at the time of their disengagement, over time, deradicalize as disengagement provides separation from the movement and, ideally, alternative pro-social networks through work, school etc. that shape one's beliefs and identity in positive ways. Disillusionment with one's involvement also provides a cognitive opening which causes individuals to question their belief in the underlying extremist ideology, often exposing inconsistencies between the ideology and one's religion; the behavior of key leaders; the strategy of the movement etc. An Islamist extremist recruiter I interviewed, for example, explained how anger with the sheikh's rules caused him and his family to leave the movement and seek more information. He started reading the Qur'an. That and interactions with others, over a period of time, caused him to question the movement, the ideology, and eventually deradicalize.

4. **<u>Re-engagement, Recidivism, and Reintegration</u>**

**Re-engagement** refers to reinvolvement in violent extremist activity after a period of disengagement. That period of disengagement may be voluntary, whereby an individual walks away from violent extremism on their own, or may be involuntary, as is the case with imprisonment or security restrictions that prevent involvement.

**Recidivism** is a subset of cases of re-engagement where reinvolvement in violent extremism follows some formal sanction (e.g., conviction, prison, indefinite detention). Recidivism is typically measured as rearrest or reconviction for a crime. In the terrorism context, however, there is greater utility in examining cases of re-engagement as violent extremists who become involved again post-release may, for example, die in the commission of an attack and thus, never be re-arrested or re-convicted of a crime or their reinvolvement may not be captured by law enforcement or the intelligence community.

*Recidivism Rates*
Although there are a number of potential measurement issues, research suggests that terrorist re-engagement and recidivism rates in developed democracies, excluding conflict zones, are quite low – less than 5%.[12] This figure is much lower than the recidivism rate for ordinary criminal offenders,

---

[11] Helen Rose Fuchs Ebaugh, *Becoming an ex: the process of role exit* (Chicago: University of Chicago Press, 1987).
[12] Omi Hodwitz, "The Terrorism Recidivism Study (TRS): An update on data collection and results," *Perspectives on Terrorism* 15, no. 4 (2021); Thomas Renard, "Overblown: Exploring the Gap Between the Fear of Terrorist Recidivism

EXHIBIT 1
Page 5 of 13     5

July 1, 2025

which falls between roughly 20% (Norway, Sweden) to over 60% (US). Extremist/terrorism offenders often serve lengthy prison sentences in developed democracies and are subject to security measures upon their release that likely limit re-engagement risk. Certain countries too, like the United Kingdom (UK), have tailored to programming to support the disengagement and reintegration of extremist offenders back into society.

*Re-engagement Risk Factors & Reintegration*
Research suggests a number of risk factors for terrorist re-engagement. These are age (with younger offenders more likely to re-engage), childhood family socio-economic status, level of commitment to the ideology, and ties to individuals still involved in violent extremism.[13] These risk factors have strong parallels in criminology where age, anti-social attitudes, and anti-social associates are strong predictors of criminal recidivism.[14]

Preventing re-engagement depends upon the successful reintegration of the violent extremist. Efforts to reintegrate the individual should consider carefully the factors that motivated their involvement in the past or could motivate their involvement in the future and seek to address them. What satisfaction, if any, did the individual obtain from their involvement in violent extremism and why? Was the individual deeply committed to the ideology? Were they looking for friendship? Purpose? The exploration of any potential sources of disillusionment with their involvement or its consequences can provide opportunities to reinforce the negative aspects of returning to violent extremism.

Age and childhood family socio-economic status are static risk factors – ones that we cannot change. Ties to those still involved in violent extremism is, however, a dynamic risk factor that can be influenced by the individual involved, intervention providers, and security restrictions (e.g., restrictions on the use of the internet, who one is allowed to see).

One's commitment to the violent extremist ideology is also a dynamic risk factor that can be shaped through interventions. While efforts to "argue" with or challenge individuals committed to a violent extremist ideology typically do not work due to psychological reactance or the lack of a credible messenger (e.g., the use of a state representative or one with ties to the state), de-radicalization is possible through: 1) the development of alternative pro-social networks through, for example, family, friends, education, work and 2) the exploitation and exploration of any potential sources of disillusionment with one's involvement in violent extremism that may provide a cognitive opening to reconsider one's views. New social networks offer alternative viewpoints and encounters, that often, over time, offer pro-social interpretations of the world and organically challenge anti-social (or extremist) attitudes. New social networks also offer opportunities that make it easier for individuals to see a life and identity for themselves outside of violent extremism.

The belief in an extreme, but non-violent, variant of a religion or any other social issue (e.g., extreme veganism), however, is not a crime. De-radicalization efforts should focus on the individual eschewing the violent extremist ideology (e.g., ISIS ideology) and related behaviors rather than their

---

and the Evidence," *CTC Sentinel* 13, no. 4 (2020); Mary Beth Altier, Emma Leonard Boyle, and John G. Horgan, "On Re-engagement and Risk Factors," *Terrorism and Political Violence* 33, no. 4 (2021).
[13] Mary Beth Altier, Emma Leonard Boyle, and John G. Horgan, "Returning to the Fight: An Empirical Analysis of Terrorist Reengagement and Recidivism," *Terrorism and Political Violence* 33, no. 4 (2021).
[14] John H. Laub and Robert J. Sampson, "Understanding Desistance from Crime," *Crime and Justice* 28 (2001).

EXHIBIT 1
Page 6 of 13       6

July 1, 2025

commitment to what may be perceived as an extreme religion or social cause, which – even if the majority disagree with – is practiced in non-violent, non-criminal ways.

*The Role of Prison*
Some violent extremists are not on law enforcement's radar and successfully disengage, on their own voluntarily, in the community. They work in conventional jobs, have conventional families, and often let go of and prefer not to revisit their violent extremist past – it is no longer a core part of their identity. Others confront a period of involuntary disengagement in the prison system. Prison can, for some violent extremists, be a rehabilitative experience as it may provide separation from the group (physically and/or online) and time to reflect on one's beliefs and behaviors. Some too have indicated that they were disillusioned, seeking a pathway out of violent extremism, and being arrested and imprisoned provided them one.

One's experience in prison and with the justice system, however, can also inhibit an individual's disengagement and reintegration upon release in at least four ways. First, perceptions of mistreatment or unfair treatment may exacerbate any grievances the individual holds with the state and fuel radicalization. One Islamist extremist I met with overseas noted this with his status in solitary confinement, which he argued violated international law and was further evidence of the state's mistreatment of Muslims. Second, encounters with extremist individuals in prison, especially when coupled with grievances, may further radicalization and increase one's violent extremist ties – both potent risk factors for re-engagement. Third, prison – especially adult prison – and security measures post-release may limit one's opportunities. Difficulty finding employment or good employment, making friends etc. may make it hard for individuals to see pathways for themselves outside of violent extremism or dying a "martyr". Finally, how one is labeled and treated in the prison and courts system and certain post-release security measures (while often necessary) may reify an individual's violent extremist identity, making it more difficult to shed.

Individuals should, of course, be held accountable for their crimes and security measures should be implemented when necessary. The point here is to highlight how the nature of one's time in prison, the court system, and post-release security measures shape the potential for rehabilitation and the likelihood for sustained disengagement. Other countries, such as the United Kingdom (UK), have in-prison and post-release programming *specifically* tailored to address these identity issues and to reduce re-engagement risk for individuals convicted of an extremism charge (e.g., the Healthy Identity Intervention). To my knowledge, there is no similar programming for those in the United States convicted of material support or other terrorism-related charges. Further, when it comes to disengagement and deradicalization, interventions and programming need to be individually tailored and regularly updated. Individuals' motivations for involvement in violent extremism differ, and the motivations may vary over time for the same individual. Psychological support is essential to help individuals process their involvement, highlight any potential sources of disillusionment, and promote disengagement.

*The Age of the Offender and Sentencing*
Research shows that adolescent brain development extends until roughly 25 years of age making adolescents and young adults more prone to impulsive, risky decision-making and more susceptible to negative peer influence and pressure or grooming.[15] This also means, however, that adolescents

---

[15] Nora Leslie Stephens, "Doing More Good than Harm: Alternatives to Incarceration for Young People Charged with Crimes of Terrorism," *Fordham Urban Law Journal* 48, no. 1 (2020): 225.

EXHIBIT 1
Page 7 of 13          7

July 1, 2025

and young adults are more amenable to change. Developmental psychologists and the United States Supreme Court agree that these differences in neurological development and the potential for rehabilitation should result in differences in sentencing.[16] As a result, alternative sentencing and tailored diversion (or "off-ramp") programming have been used for young individuals charged with material support for terrorism in cases in Minneapolis as far back as 2012 and in New York City through the DEEP Initiative now housed in the Citzens Crime Commission's Violent Extremism and Targeted Violence Prevention Program. As part of the Minneapolis initiative, some of the 6 individuals, aged 18-22, who pled guilty to material support for terrorism, were sentenced to a rehabilitation program at a halfway house under supervised release in lieu of adult prison.[17] Programs, like these, seek to enhance protective factors and lower risk factors to reduce one's risk of re-involvement in violent extremism and are most effective, when the individual is motivated by social ties or other factors, rather than a deep, genuine belief in the violent extremist ideology.

5.  **The Sentencing of Abdullah Haji Zada**

There is no doubt that the nature of this offense in serious and that if this plot materialized, it could have resulted in substantial harm to human life and society. Sentencing should reflect the gravity of this offense, but also differences in the nature of the defendants' involvement, level of human development, motivations, and vulnerabilities. Based upon my expertise and review of the evidence and the sentencing guidelines, there are a number of mitigating factors that should be taken into consideration in the sentencing of Abdullah Haji Zada (Abdullah). These include:

- Abdullah has no prior criminal history
- Abdullah's involvement in this plot and with ISIS content was driven by his brother-in-law, Nasir Tawhedi (Tawhedi). It is unclear from the evidence whether Abdullah would have carried out the attack as planned by Tawhedi, after the receipt of weapons.
- Abdullah's vulnerabilities as a juvenile of 16 when first introduced to Tawhedi – a seemingly trusted family member – as well as Abdullah's age (17) at the commission of the alleged crime. These vulnerabilities to Tawhedi were exacerbated by the absence of any other routinely available male role model within the family and a strong peer support network outside the family.
- Abdullah's involvement seems to be driven by loyalty or sense of duty to family (Tawhedi and his mother and sister Maria, in particular), rather than a deep belief in ISIS ideology.

Below I outline in more detail the evidence that led me to this conclusion with reference to relevant sentencing guidelines.

**18 USC 3553: Imposition of a sentence**

**(1) the nature and circumstances of the offense and the history and characteristics of the defendant**

---

[16] Stephens, "Doing More Good than Harm: Alternatives to Incarceration for Young People Charged with Crimes of Terrorism," 225.

[17] Stephens, "Doing More Good than Harm: Alternatives to Incarceration for Young People Charged with Crimes of Terrorism," 233-235.

EXHIBIT 1
Page 8 of 13     8

July 1, 2025

    a. *Abdullah has no prior criminal history and Tawhedi, not Abdullah, was the primary driver of the plot to carry out an ISIS attack in the United States*

- Tawhedi, not Abdullah, was the primary point of contact in ISIS-K linked Telegram channels, including with "Malik" with whom Tawhedi discussed attack plans from September 20-25. I have not seen any indication in the evidence that Abdullah was involved in these discussions.[18]
- Tawhedi asked Abdullah (as a translator) to ask CHS1 about acquiring firearms and Tawhedi (not Abdullah) later pushed the issue and made specific requests about color etc., while Abdullah translated, at the shooting range on 9-14-24.[19]
- Abdullah did not respond immediately to the photo of the gun the CHS sent and when he later did, he ignored the previous text about the weapon and simply asked if the CHS wanted to buy a printer.[20]
- Based on the surveillance footage, Tawhedi largely took the lead in the meeting to purchase weapons and relied on Abdullah to translate. Tawhedi, for instance, is the one to take out and examine the weapons at around 4:00 in the video. Abdullah does not examine or handle his weapon until they are purchased and he simply takes it in the box.[21]
- Abdullah, however, because his English was much better, was the primary point of communication for the acquisition of weapons and the selling of the family home and other property. Tawhedi relied heavily on Abdullah to translate as noted by FBI Special Agent Derek Wiley.[22]

    b. *There is no evidence to suggest that Abdullah (or his family members) engaged with pro-ISIS content or ideas, prior to the marriage of Tawhedi into the family*

- The evidence suggests that Abdullah (and his sister Maria) did not start engaging with violent extremist, pro-ISIS content prior to the arrival of Tawhedi in the United States (US) and Tawhedi's marriage to Maria in 2021. To my knowledge, Abdullah resided in the US for 5-6 years without engaging with any ISIS-K or jihadi content. Two of his older sisters and his mother worked in conventional jobs at FedEx when they resided in Texas,[23] but then ceased to work upon their move to Oklahoma. It seems that Abdullah was introduced to extremist, pro-ISIS content and encouraged to adopt such views by Tawhedi, his older sister, Maria (Tawhedi's wife), and his own mother, Nazira at the age of 16-17.[24] According to Abdullah's sister, Sadkia (aka Basikha), their mother, Nazira, and Tawhedi encouraged members of the family to pledge their allegiance to ISIS and consume ISIS-related content.[25]
- Abdullah updated his Facebook profile picture to one of a boy making the *tawhid* sign on July 24, 2022.[26] Abdullah's online engagement with violent extremist content on

---

[18] Affidavit, 10-7-24, p.16-17, p.18 #33.
[19] Affidavit, 10-7-24, p.21, Combined LDG, Timestamp 15:10 p. 2, Timestamp 6:27 p.3; 415F-OC-3966800-DECLASS_0000006_1A0000003_0000001.pdf, pp.49-50, 97, 111, 115-116.
[20] Combined LDG, TAW_004373, p.32.
[21] TAW_000003 Shop 2_Redacted High Pitch_11152024.mp4.
[22] Detention Hearing for Tawhedi, 10-17-24, p.14.
[23] OC-3966800_0000469_FINAL, p. 1
[24] Tawhedi's Social Media Report; Abdullah's Social Media Report; 415F-OC-3966800_0000543.
[25] OC-3966800_0000469_ FINAL.pdf, p. 1.
[26] FBI Reports, Combined_LDG, p.27; 415F-OC3966800_0000119_1A0000066_ 0000002_ Redboxed_Redacted.

EXHIBIT 1
Page 9 of 13     9

July 1, 2025

    Instagram escalated over the summer of 2023 and Tawhedi's attack planning began in the summer of 2024. Abdullah's sister and Tawhedi's wife, Maria's, online pro-ISIS activity also escalated on Instagram in the summer of 2023.[27] I would assume – though I am not certain – that Abdullah had more free time over the summers of 2023 and 2024 to spend with Tawhedi and his sister, Maria, if he was not working or in school. Abdullah was also completing high school online, rather than in-person, in the fall of 2024 –meaning that he interacted with Tawhedi and his family more often and more socially isolated from his peers.

c. *Abdullah's age (16-17) and familial and social environment made him more vulnerable to Tawhedi's influence. Based upon his age and the circumstances, one could argue that Tawhedi was "grooming" him for an attack.*
   - Although Abdullah waived his right to a transfer hearing, he was a juvenile during this period and certainly well below the age of 25, when individuals are more prone to impulsive, risky decision-making and more susceptible to negative peer influence and pressure. As such developmental psychologists and the courts, recommend and have, in certain cases, offered – even for terrorism charges – reduced sentencing and alternative sentencing that promotes rehabilitation for those under 25 (see pp. 7-8 of this report).
   - Although often responsible for translating and helping his family navigate US society, Abdullah does seem, at times, to lack the maturity of an adult (e.g., repeatedly running red lights;[28] impersonating Tawhedi on the phone[29]; denying his knowledge of Dari and involvement with Tawhedi and pro-ISIS content, thinking no one will know[30]).
   - Abdullah may have been more vulnerable and easily influenced due to the presence of Tawhedi (aged 25-26) as the dominant male figure in his life (and indeed home) with his father, Abdul Manaf, often on the road as a long-haul truck driver. Abdullah's sister texts that Abdullah is "the father to their family in their father's absence."[31] The significance of Abdullah's father's absence is also apparent in the father's alleged lack of knowledge of the family's plan to move back to Afghanistan[32] or the radical views of Tawhedi or others within his own family, including his wife.[33] Abdullah had no older male siblings or close relatives that I am aware of besides Tawhedi, with whom he spent significant time, in his father's absence.
   - Abdullah also had recently moved from Texas to Oklahoma. As a result of that move, Abdullah lost some of the existing social networks and friendships he had established in the US during his youth,[34] which may have made him more vulnerable to Tawhedi. Abdullah attending school online further restricted his social networks to predominantly his family[35] with Tawhedi as the only often-present male role model. Abdullah notes in

---

[27] Tawhedi's Social Media Report; Abdullah's Social Media Report; Affidavit, 10-7-24.
[28] OC-3966800-FISUR_0000033_1A0000037_ 0000001.pdf, OC-3966800-FISUR_ 0000052.pdf, OC-3966800-FISUR_0000033.pdf, OC-3966800-FISUR_0000066_1A0000065_ 0000001.pdf.
[29] TAW_004217 Telephonic Interview Nasir Tawhedi 8.30.24.
[30] Dr. Roberson Report, pp.16-17; AZ interview transcript on 10/07/2024, pg. 3.
[31] Abdullah's Phone Report, p. 8.
[32] Special Agent Derek Wiley Grand Jury Testimony, 11-6-24, p. 28.
[33] Jail Call Summaries, 10-10-24, 7:24pm, p. 15; 10-22-24, 8:30am, pp. 3-4.
[34] Dr. Roberson Report, p. 10; Dr. Trentham Report, p. 15.
[35] Dr. Roberson Report, p. 10.

EXHIBIT 1
Page 10 of 13     10

- his interview that he does not have any friends at school, but that he does talk to his classmates.[36]

d. *Abdullah's involvement may have been motivated by a sense of duty obtained through socialization in his home (normative commitment) rather than a genuine belief in ISIS ideology (affective commitment).*
- It is not clear from the evidence to what extent Abdullah genuinely believes in ISIS ideology. It does seem, however, that sometime after the marriage of Tawhedi into the family, certain members of Abdullah's nuclear family, including his older sister Maria and his mother, Nazira, adopted more and more radical and eventually violent extremist, pro-ISIS views and that these views were accepted and promoted within the family, especially by Tawhedi.[37]
- Rejection of these views was not tolerated within the family. Abdullah's older sister, Sadika (aka Basikha), eventually rejected more extreme variants of Islam and ISIS ideology out of fear for her and her family' safety. When she told their mother, Nazira, this, Nazira became angry, yelled, and locked Sadika in her room.[38] Maria, Adbullah's sister, also sent Abdullah a video about expelling "jinn" (or evil spirits) from their sister because she would not embrace their ideology.[39] Abdullah later called someone to perform this ritual[40] and Tawhedi also refers to Sadika's "jinn" problem in his interview.[41]
- As a 16–17-year-old in such a familial environment, it is possible that Abdullah promoted such views online and offline and helped Tawhedi with attack planning because he believed that was what was expected of him and encouraged/rewarded within the family.
- It does seem that Abdullah believes in a conservative version of Islam based upon his request that his mother and sisters wear the niqab and questions about whether his siblings were performing their prayers.[42] He also seemed to take issue with Sadika driving.[43] Abdullah, however, may also believe that these sorts of questions and beliefs are what is expected of him.
- Abdullah noted to Dr. Roberson that he prefers living in the US to Afghanistan, which is not what one would expect of someone deeply committed to Salafi-jihadist (ISIS) ideology.[44]

**(2) the need for the sentence imposed—**
**(a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (b) to afford adequate deterrence to criminal conduct; (c) to protect the public from further crimes of the defendant; and (d) to**

---

[36] Video interview with Abdullah Haji Zada, 10-07-24, 10:40:13.
[37] Tawhedi Detention Hearing, 10-17-24, p. 36; Tawhedi's Social Media Report, OC-3966800_0000469_ FINAL.pdf, pp. 1-2.
[38] OC-3966800_0000469_ FINAL.pdf, p. 1-2.
[39] Abdullah's phone report, p. 12.
[40] Abdullah's phone report, pp. 14-15.
[41] Interview with Nasir Tawhedi, 10-07-24, p. 17.
[42] Jail Call Summaries, 10-22-24 8:30am pp.3-4; 10-17-24, 6:14pm.
[43] Jail Calls, 11-02-24, 5:11pm.
[44] Dr. Roberson Report, p.9.

EXHIBIT 1
Page 11 of 13         11

July 1, 2025

**provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;**

a. *If this plot materialized, it could have resulted in substantial harm to human life. While it seems likely that Tawhedi would have gone through with an attack, it is less clear from the evidence what Abdullah's intentions were and how Abdullah would have acted after the receipt of the firearms.*

- According to Dr. Trentham's report, "Abdullah denies any knowledge his brother was planning a terrorist attack."[45] It seems unlikely, but nevertheless possible, that Abdullah had no knowledge of Tawhedi's intent to commit a terrorist attack. Tawhedi notes in his interview that Abdullah "cannot tolerate some stuff, he's very young"[46] and when Tawhedi was asked why Abdullah would lie, he said Abdullah "is young and may not comprehend what is happening."[47]
- Abdullah unwillingness to admit any involvement with ISIS-related content and Tawhedi's plot could also be driven by his immaturity and/or a desire to avoid disappointing or alienating his father and his mother. Admitting involvement would potentially upset his father, who does not adhere to such beliefs, has a history working for the US government, and does not seem to believe that Abdullah could have been involved or at fault.[48] Admitting involvement, showing remorse, and eschewing ISIS-ideology could also elicit disappointment from his mother, Nazira, and his older sister, Maria, who reportedly are adherents of ISIS-ideology.[49]

b. *Prior to Tawhedi's marriage into the family, Abdullah seemed to be on the path to a relatively successful life and both he and his family still seem focused on his education and a pro-social, positive future.*

- In comparison to his family members, Abdullah who grew up from the age of 11 in the US, seems to have been better integrated. The evidence suggests that the family relied on Abdullah for navigating US society. Maria, his eldest sister, for example, asked Abdullah for advice on banks, IRS tax penalties, how to cash a check at Walmart, car insurance documents, CashApp, utility and property tax bills, how to buy a phone for the house, and how to apply for Medicaid.[50] Abdullah's mother asked him what shoe size one of his younger siblings' wears and how to use the vacuum cleaner.[51]
- Both Abdullah[52] and his mother[53] seem very focused on his education, continued schooling, and future. Abdullah told Dr. Roberson that he would like to be a civil or computer engineer and he seems to perform well in math and science in school.[54]

c. *Abdullah will be deported after his release and therefore is unlikely to pose a direct threat to the US public regardless of the length of his sentence. He could, however, pose an indirect threat to the extent that he and*

---

[45] Dr. Trentham Report, p.7.
[46] Tawhedi Interview Transcript, 10-07-24, p.13.
[47] AZ Interview Transcript, 10-07-24, p.4.
[48] Jail Call Summaries, 10/10/24 7:24pm p. 15; 10/22/24 8:30 am, pp.3-4; OC3966800_0000456_ FINAL.pdf.
[49] OC-3966800_0000469_ FINAL.pdf, p. 1.
[50] Jail Call Summaries, 10-23-24, 6:17pm, p.1; 10-21-24 6:14pm p.3, 1854429, pp.2-3, 10-27-24, 12:05pm & 6:15pm; Jail Calls, 11/16/24, 20241116-1203-J_DOE.mp3, 11/08/24, 20241108-1821-J_DOE.mp, 11/02/2024, 11:01am.
[51] Jail Call Summaries, 10-16-24 6:35pm, p.9; 1854423, 10-25-24, 11:40am.
[52] Audio Surveillance 9-14-24, 51:00, Dr. Roberson Report, p.11.
[53] Jail Call Summaries, 10-21-24, 11:36am, p. 12; 10-27-24, 12:05pm; Jail Calls, 11/02/2024, 11:01am; 1854429, p.2.
[54] Dr. Roberson Report, p.11.

EXHIBIT 1
Page 12 of 13      12

July 1, 2025

> *these events become an inspiration for others to carry out attacks here in the US or abroad. Thus, support for Abdullah's disengagement and deradicalization, while in custody, are essential.*

- Just as Abdullah's adolescence and related stage of brain development make him more susceptible to impulsive decision-making and negative peer (and family) influence, it also means that he is more likely to be open to change.[55]
- Abdullah's disengagement and deradicalization are possible and will depend upon the establishment of alternative social networks and opportunities, in prison and thereafter, outside of violent extremism. His involvement seems to have been driven by familial ties and loyalty to Tawhedi, rather than a deep-seated, independent belief in violent extremist ideology.
- As ties to individuals still involved in violent extremism is an important risk factor for re-engagement, it is important that Abdullah sever any online and offline ties to individuals associated with ISIS-K or other violent extremist ideologies. The potential promotion of ISIS ideology among certain members of Abdullah's family (Nazira, Maria, etc.) is a risk factor. It does seem, however, that Abdullah's father and certain siblings, including Sadika and potentially his youngest brother, do not adhere to such beliefs.[56] The increased presence and influence of Abdul Manaf in Abdullah's life could serve as an important protective factor and Sadika notes that she is close with Abdullah and was surprised and upset when she learned of the alleged plot.[57]
- Abdullah should and seems eager to receive psychosocial support to help process these events and move forward. He notes that counselors "could help me find solutions and make it better."[58] This support should be offered during his time in custody.
- Abdullah's relationship and activities with Nasir Tawhedi should, ideally over time, be a source of disillusionment and regret that can be leveraged by trained psychologists to question his involvement and any beliefs that he or other family members have in the underlying ISIS ideology. It seems like this process may already be starting as Abdullah, for example, describes as "the worse (sic) experience of his life as getting arrested and detained in a correctional facility, away from his family".[59] Positive role models within or outside the family can also help push forward this process.

Signature: _Mary Beth Altier_    Date: 07/30/25
Mary Beth Altier, Ph.D.

---

[55] Stephens, "Doing More Good than Harm: Alternatives to Incarceration for Young People Charged with Crimes of Terrorism," 225.
[56] OC-3966800_0000469_ FINAL.pdf, pp.1-2; OC3966800_0000456_ FINAL.pdf.
[57] OC-3966800_0000469_ FINAL.pdf, pp.1-2.
[58] Dr. Trentham Report, p.6.
[59] Dr. Trentham Report, p.6.

EXHIBIT 1
Page 13 of 13    13